# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:06-cr-0210-LDG-LRL |
| v. | **ORDER** |
| SHARON SIMON, et al., | |
| Defendants. | |

Defendant Sharon Simon filed a motion pursuant to 18 U.S.C. § 3145(a) and (b)[1] to amend/revoke the magistrate judge's release/detention orders (#123, response #154, reply ##166). The court conducted a hearing on the motion on July 22, 2006.

Simon was arrested on June 1, 2006, pursuant to a 51-count indictment alleging that he was the leader of a stolen property ring that operated through the use of identity theft, aggravated identity theft, counterfeit checks and credit fraud. Also named in the indictment were 23 co-defendants, including Simon's wife, Shannon. A search of Simon's residence, a large container located on his property, and a storage unit registered to Simon recovered stolen property valued at over $1 million, stolen blank Western Union bearer checks, and ten sets of fraudulent identification. These identifications are considered "genuine fraudulent," meaning

---

[1] Section 3145 authorizes the district court to review and amend a release order or revoke a detention order. The district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990).

that they are authentic identifications obtained under false pretenses and which represent fictitious persons.

Following a series of detention hearings in which the government argued that Simon should be detained as a flight risk, Magistrate Judge Foley ordered that Simon be released on conditions, including home confinement with electronic monitoring, and the posting with the court of a surety in cash or property in the amount of $1 million. The magistrate judge explained his decision as follows:

> Based on the information that he has connections to the state of Israel, he has multiple identifiers, and there is concern that he would flee and go to the State of Israel . . . my order of detention is based on what I view as a substantial risk of nonappearance.

Simon principally argues that several issues outstanding before the magistrate judge have now been clarified, and that the substantial cash or property bond requirement is excessive. At the time the magistrate judge issued his order, the government was investigating the validity of Simon's United States passport and citizenship status. The government has since determined that Simon is a naturalized United States citizen, and that his United States passport is valid. Simon was born in Israel and is also an Israeli citizen. Simon holds an expired Israeli passport. The government also represented to the magistrate judge that Simon's parents lived in Israel. Simon, however, points out that his parents are Las Vegas residents and that both were only temporarily in Israel after Simon's father was involved in an automobile accident while traveling to visit his daughter, Simon's step-sister. Apparently, both of Simon's parents have now returned to the United States.

The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., mandates the release of a person facing trial unless no condition, or combination of conditions, will "reasonably assure" the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(c)(2). Only in rare circumstances should release be denied, and doubts regarding the

propriety of release should be resolved in favor of release. United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985).

The government carries the burden of demonstrating risk of flight by a preponderance of the evidence. Id. at 1406-07. In "determining whether there are conditions of release that will reasonably assure the appearance of the person as required" the court must "take into account the available information concerning" the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug,

(2) the weight of the evidence against the person,

(3) the history and characteristics of the person, including, (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law, and

(4) the nature and seriousness of the danger to any person or the community should the person be released.

18 U.S.C. § 3142(g). Section 3142(g) does not rank the listed factors or suggest how much weight should accorded to them. However, the Ninth Circuit has held that the weight of the evidence against the defendant is the least important. Motamedi, 767 F.2d at 1408. Furthermore, while § 3142(g) requires the court to consider the nature of the offense and the evidence of guilt, it does not permit a pretrial determination of guilt. United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986). The nature of the crime charged and the weight of the evidence, however, may assist the court in predicting a defendant's conduct if released.

Simon is not charged with a drug crime or a crime of violence. However, the nature of the stolen property scheme and its highly sophisticated use of false identification and identity theft underscores Simon's familiarity with the use of false identification and potential access to resources that could be used to falsify his identity were he to take flight. While it is true

that a mere theoretical opportunity for flight is not sufficient grounds for pretrial detention, see United States v. Himler, 797 F.2d 156, 162 (5th Cir. 1986) (possession of one false form of identification), the government in this case has shown that Simon's opportunity, and in fact, his preparation, for flight is far from theoretical. Agent Adams of the Secret Service submitted an affidavit opining that the ten sets of fraudulent identifications found in the search of Simon's storage unit were intended for Simon's flight. These so-called "run packets" contained a "genuine fraudulent" birth certificate, two forms of picture I.D., and proof of residency for Simon under a false identity, and were designed to allow an individual to flee the jurisdiction under a false identity if the need arose. Agent Adams further opined that Simon's use of such fraudulent identifications was not necessary in the purchase or resale of the stolen goods, and the government maintains that the identity of only one of the "run packets" was used in the furtherance of the scheme.

Evidence of a serious intent to flee in response to an indictment justifies detention as a serious flight risk. See United States v. Cole, 715 F. Supp. 677, 679 (E.D. Pa. 1988) (defendants told undercover agents they would flee if arrested). Here, even though there is no direct evidence that the packets were ever used to travel under an alias, the court finds the preparation of such "run packets" is strong evidence of an intent to flee if given the opportunity. Indeed, the record contains no other plausible characterization of the need for this quantity of packets, and there is no way to tell whether the government searches turned up all of them.

Access to substantial amounts of cash is another factor in making a determination as to flight risk. United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990). The government points out that the nature of the criminal enterprise provided Simon with access to large amounts of undeclared cash–almost $3 million of stolen property was sold since 2001. In addition, $70,000 that was recently withdrawn from Simon's bank account remains

unaccounted for. Simon suggests that the alleged cost of purchasing the stolen property for one-half of its value, and the value of his assets seized by the government would leave no surplus cash. Simon also states that the $70,000 has been spent.

However, even if Simon did not have access to cash from the scheme or his recent bank withdrawals, the government has submitted evidence that Simon may have access to substantial cash from another potential sources. The search of Simon's residence turned up 400 genuine blank Western Union money orders. These money orders need only be filled in with a name and dollar amount before being cashed. They have been traced back to a burglary in which 600 money orders were taken, leaving 200 still outstanding. The court agrees that if Simon has access to the outstanding money orders, he could retrieve a very sizable about of cash to finance his flight. The government has shown that Simon has also made use of separate storage containers and units, at times under false identities, which increases the possibility that Simon has caches in other locations.

Finally, the government has established that one of the fraudulent identities recovered from Simon was used to open a bank account and receive a check/debit card. Thus, there is strong evidence that Simon, were he to flee, could create a financial background under a different identity.

Community ties and foreign contacts factor into the risk of flight. Simon is a citizen of Israel by birth, and a naturalized citizen of the United States. Simon holds a valid United States passport, and an expired Israeli passport. Simon lived in Israel between 1984 and 1986, but has resided in Las Vegas for the past 17 years, and has not visited Israel for the last 12 years. His closest Israeli relative is a step-sister with whom he seldom communicates.[2] Simon also has definite connections to the community. His parents reside in Las Vegas, and a number of direct relatives live in California. Simon's family also owns real estate in Clark

---

[2] It was this individual that Simon's father had recently traveled to Israel to visit.

5

County. Simon's wife, Shannon, and two daughters, aged 2 and 4, live in Las Vegas. Shannon Simon is a co-defendant in this case, but pursuant to an agreement with the government, has been released in order to care for the children. Outside of allegedly operating the stolen property scheme, Simon has been unemployed since 2001. Under the circumstances, the government has not shown that Simon has sufficient family or business ties to Israel, nor a lack of connections to this community to support a serious flight risk.

Simon has no known criminal history, and does not suffer from physical or mental impairment. He has no history relating to drug or alcohol abuse. Simon faces between 14.5 and 17 years incarceration if convicted. The government's evidence against Simon appears strong, but that factor must carry the least weight.

The magistrate judge found that a combination of cash or property security in the amount of $1 million, and home confinement with electronic monitoring would reasonably assure Simon's future appearance. In this case, Simon's lack of criminal history and foreign contacts, and his numerous ties to the community must be weighed against Simon's sophisticated use of fraudulent identifications to create financial backgrounds and his preparation to flee as evidenced by the "run packets." Even if Simon were not accomplished at gaining access to money through the use of false identities, potential access to unrecovered monies acquired through the scheme or the negotiation of the outstanding money orders could supply Simon with substantial cash to fund a flight from authorities. Although a potential flight would not necessarily take Simon to Israel, the government and the magistrate judge expressed concern that Simon is an Israeli citizen and that Israel is a non-extraditable country. While the legal status of extraditions from Israel to the United States remains ill-defined, the court is advised that extraditions have occurred.

Considering all of the factors of 18 U.S.C. § 3142(g), the court is in agreement with the magistrate judge that Simon should be released upon the conditions imposed by the magistrate

judge including bail in the amount of $1 million, home confinement with electronic monitoring and supervision. The court, however, will amend the bail requirement to be satisfied by placing the property proffered on behalf of Simon with equity approximated at $270,000 with the court, and supplying a bail bond in the remaining amount of $730,000. The court will also amend the release order to include Simon's execution of an irrevocable waiver of extradition from Israel, and his revocation of the General Durable Power of Attorney that he holds on behalf of his father.[3] Finally, unless already conditions to his release, Simon is prohibited from renewing or obtaining any passport, and Simon shall surrender his United States passport to Pretrial Services. Accordingly,

THE COURT HEREBY ORDERS that defendant Sharon Simon's motion pursuant to 18 U.S.C. § 3145(a) and (b) to amend/revoke the magistrate judge's release/detention orders (#123) is GRANTED in part, and DENIED in part, as set forth above.

DATED this 27 day of July, 2006.

Lloyd D. George
United States District Judge

---

[3] The court has also entertained the possibility of designating Simon's wife, Shannon, as an additional supervisor, and amending her conditions of release accordingly, so that any flight by Simon would possibly result in the revocation of his wife's release. However, the court will not impose that particular condition without further input from the parties.

7